The plaintiff's lessor, to bring himself within the provisions of the treaties, gave in evidence the following documents: (156)
1. A commission from James Monroe, President of the United States, to Col. Robert Houston, dated 12 March, 1819, constituting him an agent on the part of the United States to run the boundary lines of the lands ceded by the Cherokees, and to run off and (157) locate the Indian reservations in Tennessee.
2. A certificate from Colonel Meigs, Indian agent, that the lessor of the plaintiff had enrolled himself according to the provisions of the treaties.
3. A certificate and survey made by Colonel Houston and Robert Armstrong, surveyor, of 640 acres, the land now in dispute, for and and on his account, dated 27 September, 1820.
4. A letter from the Secretary of War of the United States to Colonel Houston, inclosing the commission, and containing the following clause: "In addition to the duty required of you by the commission, you are requested to lay off also the tracts reserved in North Carolina and the Alabama Territory."
Defendant was proved to be in possession of the land described in the declaration, claiming under a purchase from North Carolina, and *Page 76 
it was also found that the lessor of the plaintiff at the ratification of the treaty of 1819 was not living on the lands contained within the lines of his survey, nor within a mile and a half or two miles of it; but he had on it a field cleared and fenced, a crib within the enclosure where he housed his corn, and a hut.
Nash, J., who presided, directed the jury that if they were satisfied that the facts stated in the documentary evidence before them were true, that the plaintiff was seized of such a title as would enable him to support an action of ejectment; that it was not essential to the validity of his title that the land should have been laid off to him by the officer of the United States in an exact square; nor was it necessary for him to show that at the ratification of the treaty of 1819 he was living upon the land. If he had an improvement upon it it was sufficient, though he was living at another place.
The jury found a verdict for the plaintiff, and a motion for (158) a new trial on the part of the defendant having been refused, from the judgment rendered he appealed.
Although this controversy is, in reality, between the plaintiff, a Cherokee Indian, on the one side, and the State of North Carolina on the other, who should certainly renounce all claim to the purchase money in the event of the defendant's being evicted; yet it is very gratifying to remark that throughout the whole progress of the business the faith of the State remains unpledged, her honor inviolate; for not the slightest inference can be drawn from any of the acts passed on the subject that she intended to sell the Indian reservations, or to confer that power upon the commissioners. The two acts confine the sale expressly to the lands acquired by treaty from the Cherokees, and are silent as to the lands reserved to the Indians. These, on the contrary, are recognized; the general reservations are protected from the purchase, lease, and cultivation of white men, under a heavy penalty; and the special ones to the two Indians called Major Walker and the Big Bear explicitly acknowledged to belong to them absolutely. 1819, ch. 997; 1820, ch. 1060; 1821, ch. 32; 1822, ch. 12; 1823, ch. 11; 1820, ch. 1062.
If the General Government had a constitutional right to make these two reservations, they had an equal right to make the whole, for the same principles apply to all. It will follow that as the commissioners were constituted for a particular purpose, and with a limited and circumscribed authority to sell the lands which were acquired by treaty, their *Page 77 
selling the lands which were reserved was an excess of authority, neither in law nor reason obligatory upon the State, their principal. But as these observations relate solely to the defendant's title, the weakness of which, however obvious, will not enable the plaintiff to recover without showing a possessory right in himself, it becomes necessary to examine the several foundations on which that right has been (159) rested and the arguments by which it has been opposed. As to the nature of the Indian title in general, it will be necessary to make a few remarks for the sake of tracing some peculiar features which have been impressed upon it at different periods by the Legislature of this State in its intercourse with some of the tribes living within its limits.
It was a principle uniformly asserted by Great Britain that the ultimate dominion of newly discovered countries not known to Christian people belonged to the discoverer; and all the colonial charters, from the first granted to Cabot by Henry VII. down to the last, of Georgia, by George II., were made while the country was yet occupied by Indians. Most of these contain a grant of the soil as well as the powers of government, and they all proceed on the principle that the crown alone had a right to grant the soil; that the Indians had ceased to have any other than the temporary right of occupancy, and that a good title might be acquired by individuals under these grants, subject to the Indian right, and to be enjoyed when that right should be extinguished. 8 Wheat., 543. While the title remained in the crown no one was permitted to purchase from the Indians, nor was any title acquired from them deemed valid without the confirmation of the crown. The Indians were allowed to occupy and hunt on the lands, and to be governed by their own laws, but could not sell or lease without the consent of the government. When they retreated farther west, which sometimes happened from the scarcity of game or the constantly advancing settlement of the whites their lands reverted to the crown in full dominion, or became vested in possession in those individuals to whom they had been previously granted. This Indian right, consisting of the usufruct more than the ownership of the soil, was rather tacitly submitted to than expressly acknowledged, for in the charters it is not noticed. The lands are granted by boundaries, including many tribes, and in the charter to the lords proprietors (160) in this State, though the boundaries extend to the South Sea, comprehending many nations, they or their rights are not noticed.
In the treaty of Utrecht (9th State Papers) the five nations were described as subjects of Great Britain; and in a proclamation issued in 1763 all purchases of lands made from the Indians were declared void unless made by treaties held under the sanction of government. In the treaty of 1763, by which Great Britain acquired from France the sovereignity of the Canadas, many nations of Indians were included in the *Page 78 
boundaries. As most of the powerful and maritime nations of Europe were animated with a spirit of discovery and settlement of new countries, it became essential to their peace to adopt some principle by which their rights should be reciprocally acknowledged. The exclusive dominion over the soil of the Indians after their temporary occupancy should cease, and the right of purchasing from them such ownership as they were acknowledged to have, was accordingly claimed by each and acquiesced in by all, and may thenceforth be considered as incorporated in the law of nations.
Writers on the law of nature have maintained the justice of this principle in furthering the designs of Providence, and tending to the increase and civilization of the human race. Montesquieu L., 10; Vattel. They argue that every nation is under a natural obligation to cultivate the land that has fallen to its share, since otherwise the whole earth, which is destined to feed its inhabitants, would not yield an adequate supply if large tracts of fertile land were peopled only by hunters and shepherds; that however right this might have been in the first ages of the world, when the spontaneous productions of the earth were more than sufficient for its few inhabitants, it cannot now be justifiable, when the great multiplication of the human race in some countries has rendered it essential to their subsistence that the forests should be cleared (161) and cultivated. The unsettled habitation of savages in those extensive tracts of country over which they wander, but cannot cultivate, must be inconsistent with the views of nature, while other nations are confined within a small compass, which no degree of skill or labor will render sufficiently productive. The only obligation which justice imposes on other nations is that they leave the natives a sufficiency of land.
It is not intended to inquire into the force of this reasoning, but only to show the nature of the claim to Indian lands set up by Great Britain, and the condition in which it was transferred to the lords proprietors. Perhaps if such weighty reasoning could not be given, dominion would be claimed on the credit of the superiority which European nations possess over the nations of the new world; for to that must be referred the conquest of the civilized nations of Peru and Mexico. On this principle Caesar acted when, forgetting the passions as well as the rights of mankind, he complained that the Britons, after having sent him a submissive message to Gaul, pretended to fight for their liberties, and to oppose his descent on their island.** *Page 79 
However extensive the right was which passed by the charter of the lords proprietors, it appears that at a very early period after the settlement of the State, 1717, reservations of land were made to the Indians by treaty; and to the Tuscaroras, the only powerful nation with whom the whites then had intercourse, a grant was made of lands in consideration of their agreeing to relinquish their claims to other lands which had before been allotted to them. Afterwards an individual obtained a grant for the same lands, and an act of the Legislature subsequently passed, 1726, confirming all grants for lands within the Indian boundary, and permitting the grantees to enter upon the Indians deserting the same. Yet it was held that a title set up under this grant could not prevail against the original grant to the Indians, although they had (162) ceased to live upon the land, since the grant contained no condition of residence, and was made by persons having power to convey to persons capable of taking and holding lands. Sacarusa v. King, 4 N.C. 336. The Legislature has, indeed, since that time, 1778, passed acts declaring that lands granted to the Indians shall revert to the State upon the natives becoming extinct or entirely abandoning the possession; but there is no instance of their having revoked a grant made to them. On the contrary, the prevalent policy before the Revolution was to consider them as persons capable of being treated with and of holding property as a tribe or nation. Their rights of property, though much circumscribed by the repeated cessions they have made by treaty, were respected as to what remained, and much solicitude is shown in repeated enactments to restrain the cupidity of the whites.
In pursuance to this policy the people of this State, when they threw off their colonial dependence and declared the soil to be the property of the community, were not unmindful of Indian rights: "Provided always, that this declaration of right shall not prejudge any nation or nations of Indians from enjoying such hunting grounds as may have been or hereafter shall be secured to them by any former or future Legislature of this State." Section 25.
Since the treaty of peace, by which the territorial limits of the State were acknowledged in as full sovereignty as they formerly belonged to the mother country, it has been the invariable object of the United States and of this State to regulate their intercourse with the Indians, not by any speculative notions of right which they might have exercised without violating any admitted principle, but by the dictates of a just, humane, and liberal policy. As to the United States, it is sufficient to refer to the treaty of Greenville, 1795, by which "The Indian tribes are quietly to enjoy their lands; hunting, planting, and (163) dwelling thereon as long as they please without molestation from the United States; but that when their tribes or any of them are *Page 80 
disposed to sell their lands, they are to be sold only to the United States; that until such sale the United States will protect all the said Indian nations in the quiet enjoyment of their lands against all the citizens of the United States, and against all other white persons who intrude on the same, and that the said Indian tribes again acknowledge themselves to be under the protection of the United States, and of no other power whatever."
Of the policy of this State, Laws 1783, ch. 185, under which the plaintiff claims title, affords a conclusive example. By this act it is declared that the Cherokee Indians shall have and enjoy all the tract of land therein described, and that it is reserved to them and their nation forever. The effect of this grant was to vest the land in the nation in fee simple; it conveyed to them a specific and definite right, according to which they could no longer be considered as tenants at sufferance, but as holding under the faith of the State and the guarantee of the declaration of rights. It is true that no individual had a distinct portion allotted to him which he might protect from aggression, and on that account the Legislature has made it penal to trespass on the land; but the right of the Legislature to make the grant cannot be doubted; and it is not less clear that it must inure to the benefit of the tribe as long as they subsist upon it and their title is not surrendered by their own consent.
If this grant required confirmation, it has received it in the most ample manner by the treaty of Hopewell, 1785, made under the authority of the United States, and by the treaty of Holstein, 1791, by which the lands not ceded by the Cherokee nation are solemnly guaranteed to them.
In this state of things the two treaties were made under which (164) the plaintiff claims the land described in the declaration as having been set off and allotted to him, and located according to the terms of the treaties, 1817 and 1819.
The 8th article of the first treaty provides that a reservation of 640 acres of land shall be given to every head of an Indian family residing on the east side of the Mississippi River, the register of whose names is to be filed in the office of the Cherokee agent. The land is to be laid off in a square, including their improvements, which are to be as near the center thereof as practicable, in which they will have a life estate, with a reversion in fee to their children, reserving to their widow her dower. By the second article of the latter treaty it is provided that a reservation of 640 acres of land shall be allowed to each head of any Indian family residing within the ceded territory who chooses to become a citizen of the United States in the manner stipulated in said treaty.
The only manner stipulated in the treaty of 1817 is that the Indians who wish to become citizens shall register their names in the office of the *Page 81 
Cherokee agent. This has been done by plaintiff, as appears from the certificate of the Indian agent, and the 640 acres of land have been surveyed and laid off for him.
The following objections have been made to the plaintiff's recovery:
1. That the commissioners who made the treaty had no authority to make reservations to the Indians, but only to extinguish their title; when that is done the land reverts to the State by force of its ancient seisin, and that the Government of the United States is restrained by the Constitution from granting the territory of or dismembering a State.
2. That, supposing the commissioners had this power, they have not executed it, but only agreed to do so; the contract was intercepted by the paramount right of the State.
3. That the land is not laid off in a square of 640 acres, to (165) include the improvements, which are to be as near the center of it as possible.
4. That Armstrong made the surveys without proper authority.
5. That his plat was not returned to the General Government.
1. The first objection is founded on the assumption that the treaty has first extinguished the title of the Indians to the whole lands granted them by the act of 1783, and then assigned part of it to the plaintiff; but a just construction of the treaty will not, in my apprehension, warrant this conclusion. It extinguishes all the Indian title except to those lands which were reserved. The very term "reservation" imports in common acceptation something kept back or not surrendered. The plaintiff does not derive his title from the treaty, but from the act of 1783, which gave the whole land to him in common with the rest of the nation. His claim in severalty is alone derived from the treaty and the location made according to it. As well might it be said that if a grant were made to three persons as tenants in common of 100 acres of land, and they agree to sell the land to a fourth person, reserving 10 acres to one of them, to be laid off by metes and bounds, that he held the land under the surrender and not under the original grant.
As the United States have alone the power of making treaties, their acts within the limits of their authority must be obligatory on the State, their constituent. They might unquestionably have extinguished the Indian title to the whole tract, in which case the right to the whole would have reverted to the State. Why, then, may they not extinguish the title to a part? The stipulations of the treaty are equally binding on both parties; and it was not to have been expected that an acquisition so valuable could have been made to the State without some equivalent. The reservations are more entitled to respect since (166) they further the policy of the State in leading the few Indians that remain to an agricultural and civilized life. *Page 82 
According to this view of the case, any opinion on the power of the United States to grant away any part of the territory of the State would be extra judicial. That question would arise if the grants had been made out of other lands, the title to which did not previously subsist in the Indians, or if the cession had been made by one treaty and the reservation by a subsequent one.
2. The words of the treaty are: "do agree to allow a reservation of 640 acres of land to each head of a family formerly residing within the ceded territory." 1819, Art. 2. The words "do hereby allow or reserve"
would have been more technical; but treaties and legislative acts are to be construed in good faith according to the intention of the parties making them. The reservations were allowed by the treaty in words of sufficient import, not of any particular 640 acres to any individual, for that depended upon the future acts of enrollment and the location. By these acts the general reservations became particular ones, according to the case of Rutherford v. Green, 2 Wheat., 197. By the act of 1782 it was provided "that 25,000 acres shall be allotted to General Green, his heirs and assigns, within the bounds of the lands reserved for the use of the army, to be laid off by commissioners." It was contended against the general's title that the words gave nothing; that they indicate an intention to give in future, but create no present obligation on the State nor present interest in General Green. But it was held by the Court that it was a present donation, not of any specific land, but of 25,000 acres within the territory set apart for the officers and soldiers, and that when the survey and allotment had marked out the land it became a particular gift of the land contained in the security. The words (167) of the treaty are quite as strong as if they were in the present tense, and were evidently intended to be used in the same sense.
3. If the plaintiff claims title under the treaty of 1819, Art. 2, this objection fails in its application, for that provides simply for an allowance of 640 acres of land to those who become citizens according to the 5th article of the treaty of 1817. It makes no sort of provision for the manner in which the land shall be located, but confines that to special reservations for those Indians whose names are inscribed on the list annexed to the treaty. But if the claim is founded on the first treaty, it does not furnish an objection to the title. The survey was to be made by the State through its agent, the United States. If laid off in a different shape from that specified in the treaty, the Indian might have excepted to it, but it is not competent for the State to do so after the Indian has accepted of it. It was not to be expected that the Indians could control and direct the manner in which the lands were run, and it would be a most unjust act to deprive them of the land because the surveyor, the officer of the Government, had departed from the shape *Page 83 
specified in the treaty. It has been often decided that purchasers from the State shall not be injured by the mistakes of those who are appointed by the State to lay off and survey the land entered.
4. The first treaty provides that the land ceded by the Indians by the first and second articles shall be run by a commissioner or commissioners appointed by the President of the United States, 1817, Art. 11, and the land ceded by the first article of the treaty, 1819, Art. 5, are to be run by a commissioner appointed by the President; but the treaties are silent as to the persons by whom the lines of reservation are to be run. If, therefore, they are run under the authority of the United States, I think the treaty may be substantially executed without a commission from the President. It is true that his commission to Mr. Houston authorizes him to lay off the reservations in Tennessee (168) as well as to run the line of the cession. The act of running the lines, then, of the reservations, if not otherwise provided for by the treaty or by law, seems to me to come within the power of the duty of the Secretary of War as prescribed by law. 2 U.S. L., 32. It is a reasonable presumption that he was entrusted with this duty by the President, more especially as the Secretary of War was the person by whom the treaty of 1819 was made, and he must have been apprised of the necessity of laying off the reservations. To require proof of the President's authority to the Secretary for every act done in the course of his multifarious duties would be a strictness not to be foreseen or calculated upon in the ordinary transaction of business.
5. A general title to the land vested by the treaty in those who should comply with the condition of becoming citizens in the manner prescribed. This became a special and definite title to 640 acres as soon as the survey was completed and returned. The surveyor's plat of the land claimed has been exhibited in the present case, and by that the plaintiff has been enabled to ascertain and identify the tract allotted to him.
The validity of his title cannot be affected by the neglect of the surveyor to return a copy of the plat to the General Government.
Upon the whole case, my opinion is that the reservation was rightfully and constitutionally made, and that the plaintiff has proved a good title to the land described in the declaration, and, moreover, that the State commissioners exceeded the limits of their authority in selling the said land to the defendant.
** Caesar questus, quum ultro, in continentem legatis missis, pacem a se petissent, bellum sine causa intulissent. Lib. 4 de BelloGallico.