## UNITED STATES v. WRIGHT et al.
### No. 3176.

Circuit Court of Appeals, Fourth Circuit.
Oct. 12, 1931.

Thomas J. Harkins, Sp. Asst. to Atty. Gen. (Chas. A. Jonas, U. S. Atty., of Lincolnton, N. C., on the brief), for the United States.

Felix E. Alley, of Waynesville, N. C. (Edwards & Leatherwood, of Bryson City, N. C., and Alley & Alley, of Waynesville, N. C., on the brief), for appellees.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

PARKER, Circuit Judge.

This is an appeal from an order denying an injunction in a suit brought to restrain the sale for state and county taxes of land of the Eastern Band of Cherokee Indians conveyed to the United States in trust pursuant to the provisions of the Act of June 4, 1924, 43 Stat. 376 (25 USCA § 331 note). The question involved is the constitutionality of the provision of that act which exempts from taxation by the state the land conveyed until same shall have been divided and allotted to the various members of the band of Indians and until restrictions on the alienation of the allotments shall have been removed. Notwithstanding this provision, the land was assessed for taxes for the year 1926 by the commissioners of Swain county, was sold by the sheriff of that county for nonpayment of the taxes so assessed, and was purchased at the tax sale by the commissioners of the county for the amount of the taxes. This suit was then instituted by the United States against the county commissioners, the sheriff, the former sheriff and tax collector, and the register of deeds of the county to enjoin the execution, acceptance, or registration of any deed pursuant to the tax sale, to have the sale itself declared void, and to require that the assessment of taxes be revoked and canceled. The court, being of the opinion that the act of Congress was unconstitutional and void in

so far as it attempted to exempt the land from taxation, denied the injunction, and the United States has appealed.

The land in question lies in Swain county, N. C., and is known as the "Qualla Boundary." Fee-simple title thereto was acquired by the Eastern Band of Cherokee Indians by purchases made in behalf of the band and pursuant to decrees of the District Court of the United States for the Western District of North Carolina in suits instituted by the United States in behalf of these Indians. The Eastern Band of Cherokee Indians is a remnant of the Cherokee Tribe which emigrated west after the treaty of New Echota in 1835 and occupied lands beyond the Mississippi pursuant to the provisions of that treaty. This remnant remained behind in North Carolina and continued to occupy a portion of the old hunting grounds of the tribe, being permitted to remain by a statute of the state subsequently enacted, and later receiving from the state a corporate charter under which they exercised a limited form of tribal government. For a clear understanding of the questions involved in the case, it is necessary to consider briefly the history of these Indians with special reference to their title to the land here involved.

The Cherokees were one of the tribes which originally occupied and roamed over territory now embraced within the states of North Carolina, South Carolina, Tennessee, Georgia, and Alabama. After the discovery of North America, England claimed the sovereignty over this territory, but recognized the right of the Indians to occupy the lands of which they had possession and to govern themselves therein. After the colonies had achieved their independence, the thirteen independent states which then came into being succeeded under the treaty of peace to the rights of England in this territory. See Treaty of Paris of June 14, 1784; Johnson v. M'Intosh, 8 Wheat. 543, 5 L. Ed. 681. The result of this was that the sovereignty over the territory embraced within the several states, together with the title to land not previously granted, passed to these states, subject to the possessory right of the Indians over the lands which they occupied. Fletcher v. Peck, 6 Cranch, 87, 3 L. Ed. 162; Worcester v. Georgia, 6 Pet. 515, 8 L. Ed. 483; Eu-che-lah v. Welch, 10 N. C. 155. And, when the right of the Indians was extinguished as to any particular land, this right passed to the state in which the land was situate. The several states thus asserted a title to these lands,

which was independent of the will of the Indians, and which took effect, in point of possession, when the right of the Indians ceased. Cherokee Nation v. Georgia, 5 Pet. 1, 17, 8 L. Ed. 25; Strother v. Cathey, 5 N. C. 162, 3 Am. Dec. 683.

By successive treaties beginning with the Treaty of Hopewell in 1785 (7 Stat. 18) and ending with the Treaty of New Echota in 1835 (7 Stat. 478), the possessory right of the Cherokee Tribe over lands in North Carolina was gradually extinguished, and all of such land was made subject to grant by the state. Under the treaty last named, the tribe surrendered all right to any lands in North Carolina, and agreed to remove from the state, in consideration of a payment of money by the United States and a grant of lands beyond the Mississippi. As originally drafted, article 12 of that treaty provided that such heads of Cherokee families as desired to remain within the states of North Carolina, Tennessee, and Alabama, subject to the laws of those states and qualified to become useful citizens, should be entitled to a "pre-emption rate of 160 acres at the minimum Congress price, to include their improvements." By supplementary articles, this pre-emption was declared void, and article 12 was amended to provide merely that such Cherokees as were averse to removal and desired to become citizens of the states where they resided, if qualified to take care of themselves and their property, should receive their proportion of all the personal benefits accruing under the treaty "for claims, improvements and per capita." Notwithstanding this treaty, great reluctance to go West was manifested on the part of large numbers of the Cherokees, and General Scott was sent to the country with troops, and was instructed to remove all of them, except such as were entitled to remain under article 12. A considerable number were allowed to remain under that article, however; and this number was doubtless augmented by those who escaped the vigilance of the troops. The number remaining in North Carolina in 1838 was estimated at between 1,100 and 1,200. By 1849 the number had increased to 2,133. It is now about 2,800.

The status of the Indians who thus remained in the state was anomalous. Their connection with the Cherokee Tribe had been dissolved, and they were without interest in the lands acquired west of the Mississippi, or in the commuted annuity fund to which the tribe was entitled. Any interest which they may be said to have had in

the lands formerly held by the tribe in North Carolina had been divested by the treaty, and even their right of tribal self-government had come to an end. Cherokee Trust Funds, 117 U. S. 288, 6 S. Ct. 718, 29 L. Ed. 880. They became subject to the laws of the state of North Carolina (State v. Ta-cha-na-tah, 64 N. C. 614; State v. Wolf, 145 N. C. 440, 59 S. E. 40, 13 Ann. Cas. 189), while not admitted to the rights of citizenship in the state (U. S. v. Boyd [C. C. A. 4th] 83 F. 547, 553). They continued to remain upon the lands which they and their ancestors had occupied, however, continuing their tribal life; and gradually they were restored to something approximating their former status as an Indian tribe under the protection of the United States. Title to the land which they occupied was acquired for them. The government supervised their contracts, educated their children, and made generous provision for their support. And, although they remained subject to the laws of North Carolina, they were granted a charter by the state which authorized them to exercise limited powers of self-government.

The first recognition by the government of the United States of the rights of the Indians who remained in North Carolina was in the act of July 29, 1848, 9 Stat. 252, 264, § 4 (31 USCA § 711 [20]) and section 5 (page 265), by which it was provided that the number and names of the Cherokees in North Carolina after the Treaty of New Echota be ascertained and a fund set apart for them, the interest on which should be paid annually to the individuals entitled or their legal representatives, with further provision that, whenever they should desire to remove west of the Mississippi, the fund so set apart should be used for that purpose. With funds derived under this act and with other moneys paid him by the Indians, one W. H. Thomas set about to purchase for them the lands of which they were in possession and made contracts for the purchase of the Qualla Boundary here in controversy, comprising 50,000 acres or more. Immediately following the Civil War, the government refused to pay over to the members of the Eastern Band of Cherokees certain moneys to which they were entitled unless they would remove to the Indian Territory or would secure an act of the Legislature of North Carolina permitting them to remain permanently within the state. The Legislature of that state thereupon passed a statute granting this permission. Public Laws of North Carolina of 1866, c. 54, p. 20.

By the purchases of Thomas, therefore, this Eastern Band of Cherokees had acquired the right to the possession of a large boundary of land in North Carolina, and by the North Carolina statute of 1866 they had acquired, with the approval of the government of the United States, permission to remain permanently in that state. Their economic status had thus been practically restored to what it was prior to the Treaty of New Echota; and Congress in the act of July 27, 1868, 15 Stat. 228, recognized this status by providing that the Secretary of the Interior should cause a new roll or census to be made "of the North Carolina or Eastern Cherokees," and that thereafter the Secretary of the Interior should "cause the Commissioner of Indian Affairs to take the same supervisory charge of the Eastern or North Carolina Cherokees *as of other tribes of Indians.*" (Italics ours.)

It was not long after Congress had adopted this policy until the protecting arm of the government was again needed by this Indian band. In purchasing the Qualla Boundary for their benefit, Thomas had taken title in his own name, intending to make conveyance to the Indians when the lands were finally paid for and the rights of all interested parties determined. He became insane, however, before this could be done. In the meantime, one Johnston, a creditor of Thomas, had the land sold under execution and purchased it, entering into a contract with the Indians which allowed them to redeem the land upon paying the balance due by Thomas. It appeared also that Thomas had entered into various agreements with individual Indians respecting these lands; and the rights of the individuals and of the band seemed involved in hopeless confusion. Congress thereupon, by the Act of July 15, 1870 (16 Stat. 362, § 11) authorized suit to be instituted in the Circuit Court of the United States for the Western District of North Carolina against Thomas, Johnston and others to establish the rights of the Indians; and such suit was accordingly begun. The matters involved were referred to arbitration, and the report of the arbitrators, which was made a rule of court, awarded the boundary here in question to the Indians, subject to the payment of approximately $18,000 to Johnston. The Act of March 3, 1875 (18 Stat. 447), made provision for the payment of this amount, together with the costs of suit and attorneys' fees, and the money was paid and deed conveying the land was executed to the Commissioner of

Indian Affairs in trust for the use and benefit of the Indians.

A second suit involving the title to these lands was later instituted against Johnston and others, and Congress made an appropriation for defraying the expenses thereof. Act of August 19, 1890, 26 Stat. 338, 357. The suit was compromised in the year 1894, and $68,000 was appropriated by Congress to carry the compromise into effect. Act of August 23, 1894, 28 Stat. 424, 441. In 1890 the lands were sold for taxes and purchased by one D. W. Kerr. By Act of August 4, 1892, c. 376, 27 Stat. 348, an appropriation was made by Congress for their redemption, and it was provided that the Secretary of the Interior should use such amount of the funds to the credit of the band as might be necessary "for the payment annually of taxes" upon the lands in question. Taxes upon the lands were so paid thereafter down to and including the taxes for the year 1925.

In 1889 these Indians were given by the Legislature of North Carolina the corporate charter heretofore mentioned, which authorized them under the name of the Eastern Band of Cherokee Indians to sue and be sued, plead and be impleaded, and exercise all other powers belonging to corporations under the laws of North Carolina. Priv. Laws 1889, c. 211. This act also validated, as against the state, titles or conveyances of land made to the band or to any person in trust for their benefit. Chapter 207 of the Private Laws of 1897 amended the charter by conferring on the band certain limited powers of government having special reference to the control of tribal property. After this charter was obtained, it was provided in the compromise decree in the second suit with Johnston that the lands held by the Commissioner of Indian Affairs should be conveyed by him to the corporation, but that nothing therein contained should "be construed as interfering with the right of the Commissioner of Indian Affairs from exercising such supervisory charge over the person and property of said band of Indians and the members thereof and the contracts of said Indians as that officer now has by virtue of the Constitution of the United States and the treaties and laws in pursuance thereof." The deed of the Commissioner of Indian Affairs conveying the lands to the corporation contained the same proviso. Under it the title was conveyed to and remained in the corporation until conveyed to the United States on July 21, 1925, pursuant to the provisions of the Act of June 4, 1924, 43 Stat. 376 (23 USCA § 331 note); the taxes thereon, as above stated, being paid pursuant to act of Congress.

Not only with respect to the acquisition and preservation of the title to this land, but also in practically every other way imaginable, the government of the United States from 1868 to the present day has continuously guarded and protected the interests of this band of Indians, and has done everything possible to promote their progress and development. It has supervised their contracts and instituted suits for the cancellation of contracts which were thought not advantageous to them. U. S. v. Boyd (C. C.) 68 F. 577; Id. (C. C. A.) 83 F. 547. It has appointed agents to guide them in the management of their affairs. It has built schools, including a large boarding school, and provided teachers for the education of their children. It has provided an experienced farmer to go among them and teach them the arts of agriculture. It has provided a hospital for the care of their sick, and has made provision for the care of their deaf, dumb, blind, and insane. It has provided a physician and a field nurse to go among them and care for the sick in their homes. It has furnished food and clothes for their school children, and has made allowances to members of the tribe to aid in their support. In other words, it has for more than sixty years treated them in all respects as wards of the nation, and has expended in recent years more than $100,000 annually for their support. It appears that for the fiscal year 1930 the appropriation for this purpose was approximately $135,000.

In contrast to this, the state of North Carolina has afforded them few of the privileges of citizenship. It has not furnished them schools, and forbids their attendance upon schools maintained for the white and colored people of the state. It will not receive their unfortunate insane or their deaf, dumb, or blind in state institutions. It makes no provision for their instruction in the arts of agriculture or for the care of their sick or destitute. It supervises their roads; but until comparatively recent years these were maintained by their own labor. It affords them the protection of the laws of the state; but, because their land is held in common and they live under a primitive tribal organization, the laws of the state, which are adapted to an advanced civilization, touch their lives at but very few points. In other words, the life of this band of Indians, from an economic standpoint, both

in its relation to the federal government and to the state, has been for more than sixty years practically that of other Indian tribes. Politically they have been subject to the laws of the state, but economically they have been wards of the federal government and cared for as such under the provisions of its laws.

In 1924 it was decided that these people had made such progress in civilization under the tutelage of the federal government that the time had come for them to abandon the primitive tribal life under which they had been living and enter the life of the nation as citizens with the right of private property over their possessions as distinguished from the communal ownership theretofore existing. On June 2, 1924, a general act was passed admitting all noncitizen Indians to citizenship. Act of June 2, 1924, 43 Stat. 253. At practically the same time an act was passed for dividing among this Eastern Band of Cherokees the property which they had enjoyed in common so that same might be held by them in severalty—the whole expense as well as trouble of dividing and distributing the property being assumed by the government. Act of June 4, 1924, c. 253, 43 Stat. 376 (25 USCA § 331 note). Realizing that many members of the tribe, not accustomed to the competitive life of a free community, might not be able to protect their possessions properly, Congress extended to them the protection, which had been adopted in similar cases, of providing that for a period of twenty-five years the allotments of land made to them should not be alienable or subject to claims or demands against the allottee, unless the restrictions on alienation should be removed under rules to be adopted by the Secretary of the Interior. In this connection, the act further provided that from and after the expiration of the tax year following that in which the act was approved all restricted allotments and undivided property should be exempt from taxation until the restrictions on the alienation of such allotments should be removed or the title of the band to such undivided property should be extinguished. It is this provision which defendants claim to be in violation of the Constitution.

In considering the constitutionality of the provision, three questions arise for our determination: (1) Has Congress the power to exercise guardianship over the Eastern Band of Cherokee Indians, or, to state the same question differently, does this band constitute such a tribe of Indians as is subject to the guardianship of Congress? (2) Is the acceptance of a conveyance in trust of the lands of these Indians and an allotment of same in severalty a proper exercise of such power? and (3) Is such a trust an instrumentality of the federal government which Congress may exempt from taxation by the state? All the other questions raised in the briefs of counsel and discussed in the very able opinion of the judge below bear ultimately upon these three.

While the power of Congress over the Indians has been said to be conferred by the Commerce Clause of the Constitution (Cherokee Nation v. Georgia, 5 Pet. 1, 8 L. Ed. 25), the power thus conferred has always been given a liberal interpretation; and it has been recognized from the beginning that legislation assuming control of Indian affairs and regulating the ownership and distribution of the property of Indians lies within the power of Congress. Sisseton & Wahpeton Bands of Sioux Indians v. U. S., 277 U. S. 424, 437, 48 S. Ct. 536, 72 L. Ed. 939; Stephens v. Cherokee Nation, 174 U. S. 445, 19 S. Ct. 722, 43 L. Ed. 1041. In the leading case of United States v. Kagama, 118 U. S. 375, 6 S. Ct. 1109, 1114, 30 L. Ed. 228, Mr. Justice Miller bases this power of Congress upon the ground that the Indians are wards of the nation. Said he: "These Indian tribes are the wards of the nation. * * * From their very weakness and helplessness, so largely due to the course of dealing of the federal government with them, and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the executive, and by congress, and by this court, whenever the question has arisen. * * * The power of the general government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection, as well as to the safety of those among whom they dwell. It must exist in that government, because it never has existed anywhere else; because the theater of its exercise is within the geographical limits of the United States; because it has never been denied; and because it alone can enforce its laws on all the tribes."

And in United States v. Sandoval, 231 U. S. 28, 34 S. Ct. 1, 5, 58 L. Ed. 107, in upholding legislation enacted for the protection of the Pueblo Indians, whose status as to citizenship in New Mexico was open to question and who owned in fee simple the land upon which they were located, the Su-

preme Court, speaking through Mr. Justice Van Devanter, said: "Not only does the Constitution expressly authorize Congress to regulate commerce with the Indian tribes, but long-continued legislative and executive usage and an unbroken current of judicial decisions have attributed to the United States as a superior and civilized nation the power and the duty of exercising a fostering care and protection over all dependent Indian communities within its borders, whether within its original territory or territory subsequently acquired, and whether within or without the limits of a state."

 The fact that the Eastern Band of Cherokee Indians had surrendered the right to their tribal lands, had separated themselves from their tribe, and had become subject to the laws of the state of North Carolina, did not destroy the right or the duty of guardianship on the part of the federal government. The fact that they constituted a community of these aboriginal people who were wards of the government was sufficient basis for the exercise of the power; and to what extent the power should be exercised was for Congress to decide. Even the conferring of citizenship upon the Indians and allotment of lands to them in severalty does not place them beyond the reach of congressional regulations adopted for their protection. United States v. Sandoval, supra; Tiger v. Western Inv. Co., 221 U. S. 286, 31 S. Ct. 578, 55 L. Ed. 738; Heckman v. U. S., 224 U. S. 413, 32 S. Ct. 424, 56 L. Ed. 820; U. S. v. Nice, 241 U. S. 591, 36 S. Ct. 696, 60 L. Ed. 1192; Brader v. James, 246 U. S. 88, 96, 38 S. Ct. 285, 62 L. Ed. 591. And the principle is well settled that whether the protective and regulatory power of Congress shall be extended over an Indian community is a political question with the determination of which the courts have no power to interfere. United States v. Holliday, 3 Wall. 407, 419, 18 L. Ed. 182; Tiger v. Western Inv. Co., supra; United States v. Sandoval, supra; Sisseton & Wahpeton Bands of Sioux Indians v. U. S., supra. As said by Mr. Justice Miller in the Holliday Case: "In reference to all matters of this kind, it is the rule of this court to follow the action of the executive and other political departments of the government, whose more special duty it is to determine such affairs. If by them those Indians are recognized as a tribe, this court must do the same. If they are a tribe of Indians, then, by the Constitution of the United States, they are placed, for certain purposes, within the control of the laws of Congress. * * * This pow-

er residing in Congress, that body is necessarily supreme in its exercise. This has been too often decided by this court to require argument, or even reference to authority. Neither the constitution of the State nor any act of its legislature, however formal or solemn, whatever rights it may confer on those Indians or withhold from them, can withdraw them from the influence of an act of Congress which that body has the constitutional right to pass concerning them."

And the rule is thus stated by Mr. Justice Van Devanter in the Sandoval Case: "Of course, it is not meant by this that Congress may bring a community or body of people within the range of this power by arbitrarily calling them an Indian tribe, but only that in respect of distinctly Indian communities the questions whether, to what extent, and for what time they shall be recognized and dealt with as dependent tribes requiring the guardianship and protection of the United States are to be determined by Congress, and not by the courts."

In this case there can be no question but that the Eastern Band of Cherokee Indians is a distinctly Indian community. Congress for more than half a century has recognized it as such, and has extended to it the guardianship and protection of the government. In the opinion of Assistant Attorney General Campbell in 1904 approved by Secretary Hitchcock (copied in the record at pages 117–141) is contained a summary of the acts of Congress passed up to that time for the care and protection of the band, and the Assistant Attorney General thus summarizes his conclusions with regard thereto: "From the foregoing necessarily prolix recitals it is manifest that the government has all along exercised a supervisory control over this band of Indians both in matters growing out of the treaties with the Cherokee Nation proper and the relations of the band itself involving the approval and disapproval of deeds and contracts with respect to the acquisition and sale of their lands and the disposal of the timber thereon. Since 1868, under specific legislation, the same supervisory charge has been taken of the Eastern Band of Cherokee Indians of North Carolina as of other tribes of Indians. There is nothing in recent legislation nor in the decrees of the courts to warrant the adoption of a different course or policy in regard to them. On the contrary the courts fully recognize such authority and decline to interfere with its exercise, thus conceding that it exists nowhere else."

In United States v. Boyd (C. C. A. 4th) 83 F. 547, 555, supra, this court dealt with a suit instituted by the United States to declare void a timber contract entered into by the band. In holding that even in the absence of fraud a contract not approved by the Department of the Interior would not be enforced, Judge Goff, after reciting various acts of Congress showing that the government was exercising the right of guardianship over the affairs of the band, said: "This shows that the original condition of the Indians in this country—that of pupilage under the government—has not been released, so far as this Eastern Band of Cherokees is concerned. It thus appears that the political departments of the government have recognized these Indians as constituting a tribe,—at least, within the meaning of that word as it is used in the constitution of the United States; and it is a rule of the courts, in matters of this kind, to follow the action of the executive and the departments whose duty it is to determine such affairs."

In Rollins v. Eastern Band of Cherokee Indians, 87 N. C. 229, the Supreme Court of North Carolina refused to entertain a suit against this band of Indians on the ground that they were under the guardianship of the federal government. The court said of the Act of Congress of July 15, 1870 (16 Stat. 362, § 11), that, if it did not confer, it recognized a corporate capacity in them as a collective body or tribe. It said further: "The remnant band of Cherokees remaining in the state, by distinct legislative action, have been placed upon the same footing with other Indian tribes, under the protection and care of the government, and these statutory provisions [i. e. those for the protection of Indians] apply with equal pertinency and force to them as to that portion of the tribe who have emigrated, and been located in their western home. * * * It is obvious that the Indian tribes are in a state of pupilage to the general government, and the safe-guards of law are placed over them to secure them and their property from the artful practices of designing men, the dictate of an enlightened sense of national duty to the weak and defenceless of a race rapidly diminishing in numbers, and deemed incapable of self-protection."

■ On the first question, therefore, we think there can be no doubt that Congress has the power to legislate for the protection of the Eastern Band of Cherokee Indians and for the regulation of the affairs of the band. It is clear, however, that not every act of Congress with relation to the band would come within the power. As heretofore stated, the members of the band, by separation from the original tribe, have become subject to the laws of the state of North Carolina; and clearly no act of Congress in their behalf would be valid which interfered with the exercise of the police power of the state. In such a situation, a law to be sustained must have relation to the purpose for which the federal government exercises guardianship and protection over a people subject to the laws of one of the states; i. e., it must have reasonable relation to their economic welfare. We come, then, to the second question of the case: Is the acceptance of a conveyance of the lands of this band of Indians, under a trust to allot same in severalty, a proper exercise of the power of protection and guardianship which the government exercises over them? We think that it is.

■ If the guardianship and assistance rendered by the government accomplishes the purpose for which it is intended, and results in the education and development of the Indians, a time must necessarily arrive when the simple tribal life of an inferior people no longer meets their requirements. The tribal life must then be dissolved, property held in common must be divided, and the members of the tribe must be launched out in business for themselves as owners of property in severalty. These results, however, cannot be accomplished without great difficulty. The various parts of the common property are not of equal value. Through occupation, cultivation, or improvement, claims have arisen in favor of various members of the tribe which, while not amounting to title, present a strong appeal to natural justice. Lands must be valued, conflicting claims must be harmonized, and finally, a division must be made which will appeal to the sense of justice of the persons interested. After the division is made, moreover, there is grave danger that the weaker members of the tribe will not be able to hold the property allotted them in the midst of the dangers and temptations of an unaccustomed freedom. For the protection of such persons, there is need that the right of alienation be limited. Must, then, the power which has sheltered and guided these people in their struggle upward abandon them to their own devices in such a critical period and leave them to make alone and unaided the last dangerous stage of their journey? It would be a strange legal philosophy which would lead

to such a conclusion. We have no doubt that the power and duty of guardianship over these wards of the nation include the power and duty of winding up the guardianship in proper manner; and we can think of no better way of discharging the duty than that which has been adopted by Congress in this case and which is the method which has been followed in similar cases. See General Allotment Act of 1887, 24 Stat. 388; Act of July 1, 1902, 32 Stat. 641; Act of April 26, 1906, 34 Stat. 137; Act of May 27, 1908, 35 Stat. 312; and United States v. Rickert, 188 U. S. 432, 23 S. Ct. 478, 47 L. Ed. 532; Tiger v. Western Inv. Co., 221 U. S. 286, 31 S. Ct. 578, 586, 55 L. Ed. 738; United States v. Nice, 241 U. S. 591, 36 S. Ct. 696, 697, 60 L. Ed. 1192; Brader v. James, 246 U. S. 88, 38 S. Ct. 285, 287, 62 L. Ed. 591.

■ Even if some other method could be suggested, it is for Congress and not for the courts to determine what means shall be employed for the accomplishment of an end within the powers which it exercises under the Constitution. "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." McCulloch v. Maryland, 4 Wheat. at page 421, 4 L. Ed. 579. As said by Mr. Justice Van Devanter in United States v. Nice, supra: "Of course, when the Indians are prepared to exercise the privileges and bear the burdens of one sui juris, the tribal relation may be dissolved and the national guardianship brought to an end; but it rests with Congress to determine when and how this shall be done, and whether the emancipation shall at first be complete or only partial. Citizenship is not incompatible with tribal existence or continued guardianship, and so may be conferred without completely emancipating the Indians, or placing them beyond the reach of congressional regulations adopted for their protection."

In Tiger v. Western Investment Co., supra, having under consideration the right of an Indian citizen of Oklahoma to convey land allotted to him in severalty but under restrictions, the court, speaking through Mr. Justice Day, said: "Upon the matters involved, our conclusions are that Congress has had at all times, and now has, the right to pass legislation in the interest of the Indians as a dependent people; that there is nothing in citizenship incompatible with this guardianship over the Indian's lands inherited from allottees, as shown in this case; that in the present case, when the act of 1906 was passed, the Congress had not released its control over the alienation of lands of full-blood Indians of the Creek Nation; that it was within the power of Congress to continue to restrict alienation by requiring, as to full-blood Indians, the consent of the Secretary of the Interior to a proposed alienation of lands such as are involved in this case; that it rests with Congress to determine when its guardianship shall cease; and while it still continues, it has the right to vary its restrictions upon alienation of Indian lands in the promotion of what it deems the best interest of the Indian."

In Brader v. James, supra, the Supreme Court upheld the right of Congress to impose restrictions upon an allotment to an Indian, even after restrictions previously imposed had become inapplicable, saying: "In view of the repeated decisions of this court we can have no doubt of the constitutionality of such legislation. While the tribal relation existed the national guardianship continued, and included authority to make limitations upon the rights which such Indians might exercise in respect to such lands as are here involved. This authority did not terminate with the expiration of the limitation upon the rights to dispose of allotted lands; the right and duty of Congress to safeguard the rights of Indians still continued."

■ Since, therefore, Congress has the power to legislate for the protection and guardianship of this band of Indians, and since a statute authorizing the creation of such a trust in lands as is here involved is a proper exercise of the power, it follows that such a trust when created is an instrumentality of the federal government for carrying the power into execution. All that remains of the third question, then, is whether the provision of the act exempting the lands which are the subject of the trust from taxation by the state is constitutional. It has long been settled that a state may not, without the consent of the federal government, tax a means or instrumentality of the latter employed for the execution of its powers. McCulloch v. Maryland, supra. And it should be noted that what we have here is not, as was thought by the court below, a tax levied upon the property of wards of the government, but an attempt to tax property which has been deeded to the government itself to be used by it in behalf

of its wards in the exercise of a power given it by the Constitution. The power to tax is the power to destroy; and, if the tax here can be sustained, this property held by the government for a constitutional purpose can be destroyed in its hands. No one would contend that property acquired by the government for a government hospital could be taxed by the state, even though it were used solely for wards of the government who were citizens of the state. On what principle, then, can this tax be justified which is levied upon property held by the government to be applied to a purpose which is just as truly a governmental purpose as the maintenance of a hospital for disabled soldiers? The fact that the government is to allot the land among the members of the tribe does not affect the matter; for the allotment is to be made in furtherance of the governmental duty and under conditions which will protect the persons to whom the duty is owing.

The situation is this: This band of Indians was in possession of lands the fee-simple title to which was held by a corporation for its benefit, no member of the band holding title individually to any part of the land. The government, in order that the individual members of the tribe might be vested with separate property and thus prepared for independent existence in the community, accepted conveyance of the land under agreement, embodied in the statute authorizing the conveyance, that it would take the necessary action to make equitable division and would allot the property among the individual members of the tribe with such restrictions upon alienation as were deemed necessary for their protection. One of the provisions of the act, which amounted to a condition under which conveyance was made to the government, was that the property should be free from taxation while held by the government or while subject to restrictions in the hands of allottees. Before conveyance, therefore, the land was held under an ordinary fee-simple title by the corporation, just as any other property of wards is held in North Carolina. After the conveyance, it was held by the government for the purpose of accomplishing a definite governmental policy in the civilization of its Indian wards. The authorities amply support the position that property so held is not subject to local taxation, and that same may be exempted by the government even after allotment, where it is held by the allottee under restrictions.

In United States v. Rickert, supra, 188 U. S. 432, 23 S. Ct. 478, 480, 47 L. Ed. 532, it appeared that lands were allotted to Sioux Indians and were held in trust for them by the United States. In holding that neither the lands nor the improvements placed thereon were subject to local taxation, the court said: "To tax these lands is to tax an instrumentality employed by the United States for the benefit and control of this dependent race, and to accomplish beneficent objects with reference to a race of which this court has said that 'from their very weakness and helplessness, so largely due to the course of dealing of the Federal government with them and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the Executive and by Congress, and by this court, whenever the question has arisen.' United States v. Kagama, 118 U. S. 375, 384, 6 S. Ct. 1109, 1114, 30 L. Ed. 228, 231. So that if they may be taxed, then the obligations which the government has assumed in reference to these Indians may be entirely defeated; for by the act of 1887 the government has agreed at a named time to convey the land to the allottee in fee, discharged of the trust, 'and free of all charge or encumbrance whatsoever.' To say that these lands may be assessed and taxed by the county of Roberts under the authority of the state is to say they may be sold for the taxes, and thus become so burdened that the United States could not discharge its obligations to the Indians without itself paying the taxes imposed from year to year, and thereby keeping the lands free from encumbrances. * * * These principles were recognized and applied in Wisconsin Railroad Co. v. Price County, 133 U. S. 496, 504, 10 S. Ct. 341, 344, 33 L. Ed. 687, 690, in which the court said: 'The Constitution vests in Congress the power to "dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States." And this implies an exclusion of all other authority over the property, which could interfere with this right or obstruct its exercise.' It was therefore well said by the Attorney General of the United States, in an opinion delivered in 1888, 'that the allotment lands provided for in the act of 1887 are exempt from state or territorial taxation upon the ground above stated, * * * namely, that the lands covered by the act are held by the United States for the period of twenty-five years in trust for the Indians, such trust being an agency for the exercise of

a Federal power, and therefore outside the province of state or territorial authority.' 19 Op. Attys. Gen. 161, 169."

Replying to the contention that improvements placed upon the land by the Indians might be taxed even though the land itself might not be, the court said: "Looking at the object to be accomplished by allotting Indian lands in severalty, it is evident that Congress expected that the lands so allotted would be improved and cultivated by the allottee. But that object would be defeated if the improvements could be assessed and sold for taxes. The improvements to which the question refers were of a permanent kind. While the title to the land remained in the United States, the permanent improvements could no more be sold for local taxes than could the land to which they belonged."

In Carpenter v. Shaw, 280 U. S. 363, 50 S. Ct. 121, 122, 74 L. Ed. .478, the Supreme Court dealt with an attempt on the part of the state of Oklahoma to tax oil royalties derived from lands allotted to the Choctaw Indians. These lands had been allotted to the Indians under the Atoka agreement embodied in the Act of June 28, 1898, ratified August 24, 1898, 30 Stat. 495, which provided that they should not be taxable for a period of twenty-one years. The tax was held invalid as in violation of the limitation on the taxing power in the act admitting Oklahoma to statehood, which forbade taxation of Indian lands which Congress had exempted from taxation under an act held valid as relating to an instrumentality of the government. In course of the opinion, the court, speaking through Mr. Justice Stone, said: "Until the removal by the act of May 27, 1908, of existing restrictions on alienation of the allotted lands, state taxation even more remotely affecting the interests of allottees than the present tax would concededly have been forbidden as a tax upon an instrumentality of the national government. See Choctaw, O. & Gulf R. Co. v. Harrison, 235 U. S. 292, 35 S. Ct. 27, 59 L. Ed. 234; Jaybird Mining Co. v. Weir, 271 U. S. 609, 46 S. Ct. 592, 70 L. Ed. 1112; Gillespie v. Oklahoma, 257 U. S. 501, 42 S. Ct. 171, 66 L. Ed. 338; Howard v. Gipsy Oil Co., 247 U. S. 503, 38 S. Ct. 426, 62 L. Ed. 1239; Large Oil Co. v. Howard, 248 U. S. 549, 39 S. Ct. 183, 63 L. Ed. 416."

The distinction between a case such as this and one where property is purchased by or for the benefit of an Indian ward of the government is clearly drawn in McCurdy v. U. S., 246 U. S. 263, 38 S. Ct. 289, 292, 62 L. Ed. 706, and Shaw v. Oil Corporation, 276 U. S. 575, 48 S. Ct. 333, 72 L. Ed. 709. In the McCurdy Case funds held in trust for an Indian were released from restrictions and were invested in a tract of land, in the deed conveying title to which was contained a restriction upon alienation not authorized by any act of Congress. In holding the land subject to taxation, the court distinguished the case from United States v. Thurston County (C. C. A.) 143 F. 287, and said: "There is also a clear distinction between the present case and those like United States v. Rickert, 188 U. S. 432, 23 S. Ct. 478, 47 L. Ed. 542, where it was sought to tax property, the legal title of which was in the United States and which was held by it for the benefit of Indians."

In Shaw v. Oil Corporation, 276 U. S. 575, 48 S. Ct. 333, 334, 72 L. Ed. 709, moneys realized from the lease of restricted lands which had been allotted to an Indian were invested in other lands. It was held that lands so purchased were not such instrumentalities of the government as to be immune from taxation, in the absence of an express exemption by Congress. It was stated, however, that even these might be exempted by congressional action. The court, speaking through Mr. Justice Stone, said:

"What governmental instrumentalities will be held free from state taxation, though Congress has not expressly so provided, cannot be determined apart from the purpose and character of the legislation creating them. Metcalf & Eddy v. Mitchell, 269 U. S. 514, 46 S. Ct. 172, 70 L. Ed. 384. The end sought and the mode of attaining it adopted by Congress in the legislation providing for the welfare of the Indians by setting apart, by allotment or otherwise, tribal lands or the public domain, restricted for their benefit, led to the conclusion that those lands and the uses of them were so intimately connected with the performance of governmental functions as clearly to require independence of all state control so complete that nothing short of an express declaration by Congress would have subjected them to state taxation.

"Governmental agencies similarly held to be exempt are national banks, First National Bank of Hartford v. Hartford, 273 U. S. 548, 47 S. Ct. 462, 71 L. Ed. 767 [59 A. L. R. 1]; bonds of the national government, Weston v. City Council of Charleston, 2 Pet. 449, 467, 7 L. Ed. 481. Such were and still are the restricted allotted or tribal lands of the Indians. Neither leases of those lands,

Indian Territory Illuminating Oil Co. v. Oklahoma, 240 U. S. 522, 36 S. Ct. 453, 60 L. Ed. 779; nor the exploitation of the land by the lessee, Howard v. Gipsy Oil Co., 247 U. S. 503, 38 S. Ct. 426, 62 L. Ed. 1239; Large Oil Co. v. Howard, 248 U. S. 549, 39 S. Ct. 183, 63 L. Ed. 416; Choctaw, O. & Gulf R. Co. v. Harrison, 235 U. S. 292, 35 S. Ct. 27, 59 L. Ed. 234; Jaybird Mining Co. v. Weir, 271 U. S. 609, 46 S. Ct. 592, 70 L. Ed. 1112; nor his income from the lease, Gillespie v. Oklahoma, 257 U. S. 501, 42 S. Ct. 171, 66 L. Ed. 338, may be taxed by the state. * * *

"In a broad sense all lands which the Indians are permitted to purchase out of the taxable lands of the state in this process of their emancipation and assumption of the responsibility of citizenship, whether restricted or not, may be said to be instrumentalities in that process. But they are far less intimately connected with the performance of an essential governmental function than were the restricted allotted lands, and the accomplishment of their purpose obviously does not require entire independence of state control in matters of taxation. To hold them immune would be inconsistent with one of the very purposes of their creation, to educate the Indians in responsibility, and would present the curious paradox that the Secretary by a mere conveyancer's restriction, permitted by Congress, had rendered the land free from taxation and thus actually relieved the Indians of all responsibility. There are some instrumentalities which, though Congress may protect them from state taxation, will nevertheless be subject to that taxation unless Congress speaks. See Goudy v. Meath, 203 U. S. 146, 149, 27 S. Ct. 48, 51 L. Ed. 130; Gromer v. Standard Dredging Co., 224 U. S. 362, 371, 32 S. Ct. 499, 56 L. Ed. 801; Fidelity & Deposit Co. v. Pennsylvania, 240 U. S. 319, 323, 36 S. Ct. 298, 60 L. Ed. 664; Railroad Co. v. Peniston, 18 Wall. 5, 21 L. Ed. 787; Choctaw, O. & G. R. R. v. Mackey, 256 U. S. 531, 537, 41 S. Ct. 582, 65 L. Ed. 1076; Central Pac. R. R. v. California, 162 U. S. 91, 126, 16 S. Ct. 766, 40 L. Ed. 903. These lands we take to be of that character."

In the case at bar Congress has expressly exempted the lands in question from taxation; and, as these lands were paid for in part by the government itself and in part by moneys which it paid to the Indians, it would seem that the exemption would be valid under the principle laid down by Mr. Justice Stone in the case last cited, even though title had remained in the Indians and had not been conveyed to the United States. It was so conveyed, however; and, under the principles above set forth, it is exempt from taxation while held by the government except in so far as Congress has consented that it be taxed.

All that remains is to notice certain contentions earnestly pressed upon us by the able counsel for defendants. It is said, in the first place, that the tax should be sustained because the land in question has never formed a part of the public domain of the United States, but was held by this band of Indians by title in fee simple under grant from the state of North Carolina before it was conveyed in trust to the government. We agree with learned counsel as to the facts stated, but cannot accept the conclusion which he would draw from them. We agree that, when the right of the Cherokee Tribe was extinguished by the Treaty of New Echota, the benefit accrued to the state of North Carolina and not to the United States; and that the result of the treaty was to make the Indian lands subject to grant by the state. We agree, also, that the lands here in question were held by the Indians under grant from the state. But this does not affect the question with which we are dealing. The fact that the state has granted lands does not justify it in taxing them after they have been acquired by the federal government for a proper governmental purpose. Most lands occupied by post office buildings and government hospitals have been granted by the state; but no one contends that because of this the state may tax them. See Van Brocklin v. Tennessee, 117 U. S. 151, 6 S. Ct. 670, 29 L. Ed. 845.

It is next said that the Indians of the Eastern Band are citizens of North Carolina and of the United States, and that the attempt to exempt their lands from taxation, while not exempting the property of other citizens, is class legislation condemned by the Constitution. There is no question but that the members of the Eastern Band are citizens. The general law admitting all Indians to citizenship was approved two days before the act here in question. 43 Stat. 253. In addition to this, there is a question whether all members of the band born subsequent to the adoption of the Fourteenth Amendment did not become citizens at birth, as they were not born within the jurisdiction of an Indian tribe exercising self-government, as was the case in Elk

v. Wilkins, 112 U. S. 94, 5 S. Ct. 41, 28 L. Ed. 643, but within the jurisdiction of the state of North Carolina. See United States v. Wong Kim Ark, 169 U. S. 649, 18 S. Ct. 456, 42 L. Ed. 890. But, as we have seen above, citizenship of the Indians does not affect the power of the government to exercise guardianship over them. United States v. Sandoval, supra. And the fact of such citizenship manifestly cannot affect the right of the government to accept property to be used in the exercise of the power or its right to exempt such property from taxation while being so used.

Finally, it is said that, by paying taxes on this property under act of Congress since 1890, the government has estopped itself from exempting same from taxation. It is clear, however, that, so long as the land was held by the general government or by one of its officers in trust for the Indians, it was not subject to taxation, unless Congress consented thereto. So long as it was held by the band in its corporate capacity, it was subject to taxation unless exempted by Congress. The fact that Congress authorized the payment of taxes during the whole period from 1890 to the time when the conveyance in trust was made to the government under the trust for division was therefore a mere matter of legislative policy which Congress had the right to change at any time. Apprehension of confusion which would naturally result from attempts to tax the lands after the division should have begun, together with the desire to prevent involuntary as well as voluntary alienation by allottees to whom restricted allotments should be made, doubtless influenced Congress to grant the exemption after the expiration of the tax year following the approval of the act. But, whatever the motive for the exemption, it was clearly an act within the power of Congress. The fact that Congress consents to the taxation of a federal instrumentality for a time does not mean that it must continue to give its consent forever; and, in the absence of binding contract, we see no way in which a sovereign power may be estopped from exercising a right of legislation. Certainly there is nothing here upon which such an estoppel may be predicated.

For the reasons stated, we think that the act of Congress exempting the land in question from taxation by the state is valid and constitutional, and that the United States was entitled to the relief prayed in the bill. The decree below will therefore be reversed, and the cause will be remanded for further proceedings not inconsistent with this opinion.

Reversed.