632 F.2d 373
 EASTERN BAND OF CHEROKEE INDIANS, June Taylor Maldonado,
individually and on behalf of all other similarly
situated persons, Appellants,
v.
Mark G. LYNCH, Individually and as Secretary of Revenue for
the State of North Carolina; The North Carolina Department
of Revenue; Glenn McHan, Odell Grant, William G. Davis,
individually and as Commissioners for the County of Swain;
The County of Swain, Appellees,
v.
UNITED STATES of America, Amicus Curiae.
EASTERN BAND OF CHEROKEE INDIANS, Appellant,
v.
Mark G. LYNCH, Secretary of Revenue for the State of North
Carolina; Department of Revenue, Appellees.
 Nos. 79-1588, 79-1589.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 3, 1980.
Decided Oct. 10, 1980.
 
 Ben Oshel Bridgers, Sylva, N. C. (Holt, Haire & Bridgers, P. A., Sylva, N. C. on brief), for appellants.
 David C. Shilton, Washington, D. C. (Edward J. Shawaker, Dept. of Justice, Sanford Sagalkin, Deputy Asst. Atty. Gen., Washington, D. C., on brief), for the United States as amicus curiae.
 Myron C. Banks, Sp. Deputy Atty. Gen., Raleigh, N. C. (Rufus L. Edmisten, Atty. Gen. of North Carolina, Raleigh, N. C., on brief), for appellees.
 Before BUTZNER and HALL, Circuit Judges, and WILLIAM M. KIDD, United States District Judge for the Southern District of West Virginia, sitting by designation.
 BUTZNER, Circuit Judge:
 
 
 1
 The Eastern Band of Cherokee Indians and June Taylor Maldonado, an enrolled member of the Band, appeal the district court's dismissal of their consolidated suits for declaratory judgment. The district court held that North Carolina may impose taxes on the income earned on the Eastern Cherokee Reservation by members of the Band who reside on the reservation. The court also ruled that Swain County, where the reservation is situated, may levy, pursuant to state law, taxes on personal property located on the reservation and owned by members of the Band residing there.
 
 
 2
 No federal statute expressly preempts the authority of North Carolina to impose these taxes on members of the Eastern Band. Conversely, no federal statute expressly permits the state to levy the taxes. The crux of this case, therefore, is whether the Band was required to show that a federal statute expressly prohibits this taxation, or whether the state was obliged to demonstrate federal permission to tax. The district court found that the members of the Band have been citizens of North Carolina for more than a century and that the federal government had acquiesced in state taxation of their lands before 1925. Consequently, the court ruled that the Band must show that federal legislation exempted its members from state income and personal property taxes. It upheld the validity of the taxes because no federal law expressly prohibits the state from imposing them.
 
 
 3
 We conclude, however, that because the United States recognizes the Band as an Indian tribe and holds in trust the Indian reservation on which its members live, the state must show express federal permission to impose these taxes. No statute grants this permission, and we therefore reverse the judgment of the district court.
 
 
 4
 * We begin with an examination of the Eastern Band's relationship to the state of North Carolina and to the United States. In United States v. Wright, 53 F.2d 300 (4th Cir. 1931), Judge Parker recounted the history of the Band. We need not repeat his exhaustive narrative. For the purpose of this case, a relatively brief summary of the Band's history suffices to establish the background of the state's claim that the Indians are subject to its taxing power and the Band's claim that Congress has preempted the state's authority to impose the taxes in question.
 
 
 5
 The Cherokee were one of several tribes that originally occupied the lands now composing North Carolina, South Carolina, Tennessee, Georgia, and Alabama. England claimed sovereignty over this territory but recognized the rights of the Indians to possession of the land on which they lived and to self-government. In accord with the Treaty of Paris[1] signed at the end of the Revolutionary War, the United States succeeded to England's sovereignty. When Indian possessory rights to any particular land were extinguished, the rights passed to the state in which such land was situated.
 
 
 6
 With the 1785 Treaty of Hopewell,[2] the United States initiated a policy of extinguishing Cherokee possessory rights in the southeast, including North Carolina. This goal was at least formally attained in 1835 with the Treaty of New Echota,[3] under which the Cherokee Nation ceded to the United States all possessory rights to lands east of the Mississippi and agreed to move west.
 
 
 7
 Not all of the Cherokees, however, left the southeastern states. Some remained pursuant to Article 12 of the Treaty of New Echota, which provided that those Cherokees willing to become citizens of the states in which they resided could seek from the commissioners named in the Treaty permission to remain in the east. Still other Cherokees eluded the United States military officers in charge of the Cherokee removal. In 1838 the Cherokees remaining in North Carolina were estimated to number not more than 1,200.
 
 
 8
 In 1848, Congress established a fund for the North Carolina Cherokees and provided that Indians remaining in North Carolina would receive only the interest of their portion of the fund, while each Indian moving west would be paid his share of the principal.[4] In 1855, Congress abandoned this incentive to Cherokee removal and in its place provided for payment of the principal to all North Carolina Cherokees.[5] The 1855 federal legislation conditioned payment on North Carolina's consent that the Cherokees could remain. This consent was given by the state in 1866.[6] The Cherokees used the federal payments to help purchase the land which would eventually become the Eastern Cherokee Reservation.
 
 
 9
 In 1868, Congress instructed the Secretary of the Interior to take "the same charge of the Eastern or North Carolina Cherokee as of other tribes of Indians."[7] During the next few years, Congress passed several statutes designed to save the Eastern Band from divestment of their land due to a hopelessly confused title.[8]
 
 
 10
 Later, the Eastern Band brought suit to establish its right to a pro rata share of trust funds set apart by treaty[9] for the Cherokee Nation. The Supreme Court held that the Eastern Band had no cognizable claim because Band members were no longer part of the Cherokee Nation but rather were citizens of North Carolina, bound by that state's laws. Cherokee Trust Funds, 117 U.S. 288, 309, 6 S.Ct. 718, 727, 29 L.Ed. 880 (1866).[10]
 
 
 11
 In 1887, Congress, embracing as a national goal the assimilation of most Indian tribes, enacted the General Allotment Act,[11] which allocated specific tracts of reservation lands to individual tribe members. The General Allotment Act contemplated that each allotment would be held in trust for 25 years by the United States for the benefit of the Indian to whom the allotment had been made, and at the end of that period, each Indian would receive a fee simple interest in the allotted property. Until the expiration of the 25 years, the allotments were to carry restrictions on alienability and contract. The Allotment Act did not apply in terms to the Eastern Band holdings, which had been privately purchased by the tribe.[12]
 
 
 12
 Two years after passage of the Allotment Act, North Carolina issued a corporate charter authorizing the Eastern Band to exercise all powers belonging to corporations under state law.[13] This charter was amended in 1897 to confer on the tribe limited powers of government pertaining to the control of tribal property.[14]
 
 
 13
 Meanwhile in 1892, Congress appropriated a sufficient sum of money to redeem the Band's property after it had been sold to satisfy state and local taxes.[15] The 1892 legislation also authorized the Secretary of the Interior to pay the annual taxes on the Eastern Cherokee land.
 
 
 14
 In 1924, Congress included the Eastern Band property in the federal allotment program by authorizing the United States to hold the tribe's land in trust. The Act also instructed the Secretary of the Interior to draw up a roll of tribe members, survey the land, and allot holdings with 25-year restrictions on alienation.[16] Although authorizing state taxation of the tribal lands for the 1925 taxation year, the Act expressly stated that after 1925 there could be no taxation of restricted lands.
 
 
 15
 It was against this factual background that Judge Parker wrote the Wright opinion.[17] In Wright, North Carolina challenged the constitutionality of the provision in the 1924 Act prohibiting state taxation of the Eastern Band Reservation after 1925. Although the court acknowledged that Eastern Band members were citizens of North Carolina and subject to its laws, it held that such citizenship did not deprive the federal government of the power to legislate for the protection and economic welfare of the Band. The court concluded that the prohibition against state taxation was constitutional and stated further that by virtue of the conveyance in trust to the United States, there could be no state taxation of the lands unless Congress expressly consented. Wright heavily relied on the extensive federal involvement with the tribe:
 
 
 16
 (T)he life of this band of Indians, from an economic standpoint, both in its relation to the federal government and to the state, has been for more than sixty years practically that of other Indian tribes. Politically they have been subject to the laws of the state, but economically they have been wards of the federal government and cared for as such under the provisions of its laws.[18]
 
 
 17
 Shortly after the court decided Wright, the federal policy toward Indians shifted from encouraging assimilation to favoring the preservation of Indian communities. Congress therefore enacted the Indian Reorganization Act of 1934,[19] which prohibited future allotments and extended indefinitely "the existing periods of trust placed upon any Indian lands and any restriction on alienation thereof ...."[20] The United States continues to hold the lands in trust for the benefit of the Eastern Band, and the restrictions on alienability and contract set forth in the 1924 Act remain in force.
 
 
 18
 Since passage of the Indian Reorganization Act, Congress has consistently referred to the Eastern Band property as the "Cherokee Indian Reservation" or the "Eastern Cherokee Reservation."[21] Relevant opinions of the Department of Interior's Solicitor have stressed that despite the state citizenship of tribe members, the federal government has treated the Eastern Band "in every respect" as an Indian tribe, and the lands held in trust as an Indian reservation.[22]
 
 
 19
 Our own opinions since 1934 have acknowledged federal guardianship over the Band. We have held that federal law preempts North Carolina jurisdiction over proceedings affecting the trust lands,[23] and we have refused to apply North Carolina adverse possession laws to suits involving the reservation.[24] We have also rejected contentions that the Eastern Band is not an Indian tribe and that the land it occupies is not an Indian reservation within the meaning of federal Indian trading statutes.[25] We have held that the right to sue the Eastern Band is dependent upon the consent of the United States,[26] and we have recognized that Congress has not conferred jurisdiction on federal courts to monitor tribal elections.[27] Finally, we have found that federal preemption bars North Carolina from enforcing its fishing license requirement against non-Indian fishermen on the Band's reservation.[28]
 
 
 20
 This abridged history demonstrates that the Act of 1924 significantly altered the relationship of the Band both to North Carolina and to the United States. After the 1924 conveyance in trust, notwithstanding the earlier history of the Eastern Band, the relationship of the United States to both the Band and the land upon which its members reside mirrored the relationship of the United States to the large number of tribes and reservations included in the General Allotment Act of 1887.
 
 
 21
 We repeat what our cases have decided: the members of the Eastern Band of Cherokees have a dual status. They are citizens of North Carolina. Nevertheless, they are a federally recognized Indian tribe, and the land on which they earn their livelihood is a federally recognized Indian reservation held in trust for their benefit by the United States.
 
 II
 
 22
 The second step in our analysis is to reconcile the status of these Indians as citizens of North Carolina with their federally recognized status as Indians living on an Indian reservation held in trust by the United States for their benefit. The governing principle in this analysis is that the Constitution, treaties, and federal laws pertaining to Indians are preeminent. Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832).
 
 
 23
 The Supreme Court faced a similar problem of dual status in United States v. John, 437 U.S. 634, 98 S.Ct. 2541, 57 L.Ed.2d 489 (1978), which dealt with the jurisdiction of Mississippi to try a Choctaw Indian for a crime committed on the Choctaw Reservation. In reaching its decision that the United States had exclusive criminal jurisdiction over the defendant, the Court reviewed the history of the Choctaws' relationship to Mississippi and to the federal government. John discloses that the Choctaws' history remarkably parallels that of the Eastern Band.
 
 
 24
 The Choctaws signed their own Treaty of Hopewell in 1786,[29] just one month after the Cherokees had signed their treaty with the same United States commissioners. In 1830, the Choctaw Nation entered into the Treaty at Dancing Rabbit Creek,[30] which ceded to the United States all lands east of the Mississippi still occupied by the Choctaws and stipulated that the Nation would remove to lands west of the river. As with the Treaty of New Echota, the Treaty at Dancing Rabbit Creek provided an opportunity for some Indians to remain east and become citizens of their respective states. In the early twentieth century, the federal government began to provide federal services to those Choctaws who remained in Mississippi. During this same time, the federal government purchased Mississippi lands and instituted an allotment program for the Choctaws. Eventually, as with the Eastern Band, the United States took in trust title to all lands originally purchased for the Mississippi Choctaws.
 
 
 25
 To sustain its jurisdiction, Mississippi argued in John that in light of the Treaty at Dancing Rabbit Creek and the subsequent assimilation of the Choctaws into the social and political life of the state, the federal government could no longer assert plenary authority over the Choctaws. Therefore, the state maintained, the lands held in trust by the United States were not "Indian country" as defined by 18 U.S.C. § 1151[31] and the federal government could not rely on 18 U.S.C. § 1153[32] to claim exclusive federal jurisdiction over the defendant. The Supreme Court rejected this argument in terms so relevant to the Eastern Band of Cherokees that they bear quotation in full:
 
 
 26
 We assume for purposes of argument, as does the United States, that there have been times when Mississippi's jurisdiction over the Choctaws and their lands went unchallenged. But, particularly in view of the elaborate history, recounted above, of relations between the Mississippi Choctaws and the United States, we do not agree that Congress and the Executive Branch have less power to deal with the affairs of the Mississippi Choctaws than with the affairs of other Indian groups. Neither the fact that the Choctaws in Mississippi are merely a remnant of a larger group of Indians, long ago removed from Mississippi, nor the fact that federal supervision over them has not been continuous, destroys the federal power to deal with them. United States v. Wright, 53 F.2d 300 (CA4 1931), cert. denied, 285 U.S. 539, (52 S.Ct. 312, 76 L.Ed. 932) (1932).
 
 
 27
 The State also argues that the Federal Government may not deal specially with the Indians within the State's boundaries because to do so would be inconsistent with the Treaty at Dancing Rabbit Creek. This argument may seem to be a cruel joke to those familiar with the history of the execution of that treaty, and of the treaties that renegotiated claims arising from it. And even if that treaty were the only source regarding the status of these Indians in federal law, we see nothing in it inconsistent with the continued federal supervision of them under the Commerce Clause. It is true that this treaty anticipated that each of those electing to remain in Mississippi would become "a citizen of the States," but the extension of citizenship status to Indians does not, in itself, end the powers given Congress to deal with them.[33]
 
 
 28
 John dealt with criminal jurisdiction; in this respect John differs from the case before us.[34] Contrary to North Carolina's suggestion, this difference does not render John inapposite. Indeed, John relied on Judge Parker's reasoning in Wright, which was a taxation case. Furthermore, the principal case concerning the imposition of state income taxes on reservation Indians, to which we will refer in more detail in Part III of this opinion, is McClanahan v. Arizona State Tax Commission, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973). There the Court, relying in part on Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832), said "Although Worcester on its face dealt with a State's efforts to extend its criminal jurisdiction to reservation lands, the rationale of the case plainly extended to state taxation within the reservation as well."[35]
 
 
 29
 Similarly, for the purposes of reconciling the dual status of the Cherokees as citizens of North Carolina and as Indians living on a federally held reservation, the rationale of John is controlling. We therefore cannot accept North Carolina's argument that the Treaty of New Echota establishes the state's right to impose the taxes at issue. John held that in the face of subsequent federal statutes, the Treaty at Dancing Rabbit Creek did not inalterably fix the relationship between the Choctaws and Mississippi. So, too, we hold that in light of similar federal statutes, the dominion of North Carolina over the Eastern Band, established by the 1835 Treaty of New Echota, is not immutable. Forty years prior to John, this court adopted essentially the same approach when we held in United States v. 7,405.3 Acres, 97 F.2d 417, 422 (4th Cir. 1938), that North Carolina could not apply its adverse possession laws to the Eastern Band Reservation:
 
 
 30
 (I)t makes no difference that title to the land in controversy was originally obtained by grant from the state of North Carolina, or that the Indians are citizens of that state and subject to its laws. The determinative fact is that the federal government has assumed towards them the same sort of guardianship that it exercises over other tribes of Indians ....
 
 
 31
 Although the Cherokees have long been citizens of North Carolina and although federal supervision over them has not been continuous, their current status as a federally recognized tribe residing on an Indian reservation, held in trust by the United States, is of paramount significance for ascertaining whether North Carolina can impose the taxes at issue. By implication, Moe v. Salish & Kootenai, 425 U.S. 463, 467, 96 S.Ct. 1634, 1638, 48 L.Ed.2d 96 (1976), sustains our conclusion that the current status of the Indians, rather than their North Carolina citizenship, determines the state's power to tax. In Moe the Court acknowledged that the Indians were citizens of Montana.[36] Nevertheless, it held that the state could not levy a personal property tax on automobiles owned by reservation Indians.
 
 III
 
 32
 North Carolina correctly points out that the Act of 1924[37] and 18 U.S.C. § 1153,[38] which Wright and John respectively applied, are preemptive statutes. Here, in contrast, no federal statute specifically prohibits North Carolina's taxation of members of the Band who reside on the Eastern Cherokee Reservation for income earned and personal property held there. Our final inquiry, therefore, is to determine whether in the absence of such a statute, Congress nonetheless has preempted North Carolina's power to impose the taxes in question.
 
 
 33
 In White Mountain Apache Tribe v. Bracker, --- U.S. ----, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980), the Court held that Arizona could not impose motor carrier licenses and fuel taxes, measured by the carrier's gross receipts and its consumption of diesel fuel, on a non-Indian contractor engaged solely in felling the tribe's timber and transporting it on the tribe's reserva tion. The Court's opinion reiterated the general principles governing our analysis:[39]
 
 
 34
 P "Congress has broad power to regulate tribal affairs under the Indian Commerce Clause, Art. 1, § 8, C. 3."
 
 
 35
 P The exercise of state authority may be preempted by federal law.
 
 
 36
 P General standards of preemption appropriate to other areas of the law are inapplicable to federal enactments regulating Indian tribes.
 
 
 37
 P Preemption, "standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members."[40]
 
 
 38
 P The Court has "rejected the proposition that in order to find a particular state law to have been pre-empted by operation of federal law, an express congressional statement to that effect is required."
 
 
 39
 P "When on-reservation conduct involving only Indians is at issue, state law is generally inapplicable ...."
 
 
 40
 McClanahan v. Arizona State Tax Commission, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), applied these general principles to the question of state authority to impose income taxes on reservation Indians.[41] There the Court, placing greater emphasis on the doctrine of federal preemption than on the idea of Indian sovereignty, held that in the absence of congressional consent, Arizona could not impose a tax on the income that a reservation Indian earned solely on the reservation. Although McClanahan dealt with a tribe and a state whose historical relationship differs from that of the Eastern Band and North Carolina, its breadth is illustrated by Mescalero Apache Tribe v. Jones, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973), which was decided the same day. In contrast to McClanahan, Mescalero held that tribal Indians were subject to a state gross receipts tax imposed on tribal activities conducted outside of the reservation. Distinguishing McClanahan, the Court said in Mescalero :
 
 
 41
 (I)n the special area of state taxation, absent cession of jurisdiction or other federal statutes permitting it, there has been no satisfactory authority for taxing Indian reservation lands or Indian income from activities carried on within the boundaries of the reservation, and McClanahan v. Arizona State Tax Comm'n, supra, lays to rest any doubt in this respect by holding that such taxation is not permissible absent congressional consent.[42]
 
 
 42
 We therefore believe that McClanahan's rationale is applicable to all members of federally recognized Indian tribes who earn their livelihood on federally recognized reservations.[43]
 
 
 43
 As our discussion of the tribe's status in Parts I and II establishes, since 1924 the Eastern Band has been a federally recognized Indian tribe living on an Indian reservation held in trust by the United States. McClanahan requires the state to show congressional permission to impose an income tax on such Indians. The district court therefore erred in concluding that the Eastern Band were required to show federal exemption from state taxation. Because Congress has not consented to North Carolina's imposition of an income tax on members of the Eastern Band who derive their income from activities on the reservation, McClanahan requires reversal of this aspect of the district court's judgment.
 
 IV
 
 44
 We also conclude that the general principles concerning state taxation of Indians, as explained in White Mountain Apache,[44] govern state authority to levy personal property taxes. In Moe v. Salish & Kootenai, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), the Court held that the absence of express congressional consent precluded state imposition of personal property taxes on the automobiles of reservation Indians as a condition to registration. In Bryan v. Itasca, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), the Court strengthened the presumption against congressional consent to state taxation by holding that the broad grant in 28 U.S.C. § 1360 of state civil jurisdiction over several Indian reservations should not be construed as consent to state taxation of the personal property of Indians residing on those reservations. Bryan emphasizes that state taxing authority cannot be inferred from ambiguous federal statutes.
 
 
 45
 Consequently, we hold that lack of congressional consent precludes Swain County from levying a tax on the personal property possessed by members of the Eastern Band on the reservation where they reside.
 
 
 46
 The judgment of the district court is reversed, and this case is remanded for the entry of an appropriate decree.
 
 
 
 [1]
 8 Stat. 80 (1783)
 
 
 [2]
 7 Stat. 18 (1785)
 
 
 [3]
 7 Stat. 478 (1835)
 
 
 [4]
 Act of July 29, 1848, 9 Stat. 252, 264-65
 
 
 [5]
 Act of March 3, 1855, 10 Stat. 686, 700
 
 
 [6]
 Public Laws of North Carolina of 1866, c. 54, p. 20
 
 
 [7]
 Act of July 27, 1868, 15 Stat. 228
 
 
 [8]
 See, e. g., Act of July 15, 1870, 16 Stat. 335, 362 (authorizing suit to quiet title); Act of March 3, 1875, 18 Stat. 420, 447 (authorizing federal funds to make payment pursuant to arbitration of suit)
 
 
 [9]
 See Treaty of New Echota, 7 Stat. 478, 482-83; Treaty of July 19, 1866, 14 Stat. 799, 805
 
 
 [10]
 The early history of the Cherokee Nation and Eastern Band can be found in this opinion
 
 
 [11]
 24 Stat. 388 (1887)
 
 
 [12]
 The Act applied only to "reservations" created by "treaty stipulation, executive order, or congressional act." 24 Stat. 388 (1887)
 
 
 [13]
 Private Laws of North Carolina of 1889, c. 211
 
 
 [14]
 Private Laws of North Carolina of 1897, c. 207
 
 
 [15]
 Act of August 4, 1892, 27 Stat. 348
 
 
 [16]
 Act of June 4, 1924, 43 Stat. 376
 
 
 [17]
 United States v. Wright, 53 F.2d 300 (4th Cir. 1931)
 
 
 [18]
 53 F.2d at 304-05
 
 
 [19]
 48 Stat. 984
 
 
 [20]
 25 U.S.C. § 462. Extension was conditioned on acceptance of the Act by a majority of the adult Indians living on the reservation. 25 U.S.C. § 478. Members of the Eastern Band accepted the Act in 1934. See Op. Solicitor, Dep't of Interior, Aug. 28, 1947
 
 
 [21]
 See, e. g., Act of Aug. 19, 1937, 50 Stat. 699; Act of July 2, 1962, 76 Stat. 132; Act of Oct. 22, 1970, 84 Stat. 1097
 
 
 [22]
 See Op. Solicitor, Dep't of Interior, Authority of the State of North Carolina to Tax the Income of Cherokee Indians Derived from Employment with the Federal Government (Aug. 25, 1942) (North Carolina, like other states, lacked jurisdiction to tax this income); Op. Solicitor, Dep't of Interior, State Taxation of Traders on Cherokee Reservation in North Carolina (Dec. 19, 1966) (North Carolina cannot collect privilege license taxes from Indian traders on the reservation)
 
 
 [23]
 United States v. Colvard, 89 F.2d 312 (4th Cir. 1937)
 
 
 [24]
 United States v. 7,405.3 Acres of Land, 97 F.2d 417 (4th Cir. 1938)
 
 
 [25]
 United States v. Parton, 132 F.2d 886 (4th Cir. 1943)
 
 
 [26]
 Haile v. Saunooke, 246 F.2d 293 (4th Cir. 1957)
 
 
 [27]
 Crowe v. Eastern Band, 584 F.2d 45 (4th Cir. 1978). See generally Santa Clara Pueblo v. Martinez, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978)
 
 
 [28]
 Eastern Band v. North Carolina Wildlife Resources Commission, 588 F.2d 75 (4th Cir. 1978)
 
 
 [29]
 7 Stat. 21 (1786)
 
 
 [30]
 7 Stat. 333 (1830)
 
 
 [31]
 18 U.S.C. § 1151 defines Indian country in pertinent part as "all land within the limits of any Indian reservation ... notwithstanding the issuance of any patent ...." The Supreme Court has recognized that this definition generally applies to civil jurisdiction as well as criminal jurisdiction. See De Coteau v. District County Court, 420 U.S. 425, 427 n.2, 95 S.Ct. 1082, 1084, 43 L.Ed.2d 300 (1975)
 
 
 [32]
 At the time of John's offense, 18 U.S.C. § 1153 read:
 Any Indian who commits against the person or property of another Indian or other person (certain offenses) within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.
 
 
 [33]
 437 U.S. at 652-54, 98 S.Ct. at 2551
 
 
 [34]
 In its brief, North Carolina acknowledges that John casts doubt on the viability of United States v. Hornbuckle, 422 F.2d 391 (4th Cir. 1970), which held that the state has concurrent criminal jurisdiction over the Eastern Band
 
 
 [35]
 411 U.S. at 169, 93 S.Ct. at 1260
 
 
 [36]
 In its opinion, 425 U.S. at 467, 96 S.Ct. at 1638, the Court quoted the finding of the district court:
 "As Montana citizens, members of the Tribe are eligible to vote and do vote in city, county and state elections. Some hold elective and appointed state and local offices. All services provided by the state and local governments are equally available to Indians and non-Indians. The only schools on the Reservation are those operated by school districts of the State of Montana. The State and local governments have built and maintain a system of state highways, county roads and streets on the Reservation which are used by Indians and non-Indians without restriction."
 
 
 [37]
 See note 16 supra and accompanying text
 
 
 [38]
 See note 32 supra and accompanying text
 
 
 [39]
 100 S.Ct. at 2582-84. For brevity we list these principles without setting forth the Court's reasons or citations of authority. In several instances we have paraphrased the Court's opinion
 
 
 [40]
 The Court's opinion, 100 S.Ct. at 2583, explains that federal preemption is one of two independent barriers to assertion of state regulatory authority over tribal reservations and members. The second independent, but closely related, barrier is the state's unlawful infringement "on the right of reservation Indians to make their own laws and be ruled by them." Because we conclude that preemption, standing alone, is a sufficient bar to the state's authority to levy the taxes at issue, we find it unnecessary to decide whether North Carolina's imposition of these taxes also impermissibly infringes on the Eastern Band's right to self-government
 
 
 [41]
 Although superficially appealing, reliance on federal income tax cases involving Indians is misplaced. Because Congress has plenary authority over both the federal revenue and the status of reservation Indians, federal income tax cases do not involve the question of preemption. Instead, they require interpretation and reconciliation of diverse federal statutes and exemptions. Compare Squire v. Capoeman, 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883 (1956) (profits from sale of timber felled on reservation held exempt from federal capital gains tax) with Critzer v. United States, 597 F.2d 708 (Ct.Cl.1979) (income realized on Indian's operation of a business on the Eastern Cherokee Reservation held not exempt from federal income tax)
 
 
 [42]
 411 U.S. at 148, 93 S.Ct. at 1270
 
 
 [43]
 The Task Force on Federal, State, and Tribal Jurisdiction observed that by the Treaty of New Echota of 1835 North Carolina assumed full jurisdiction over the Eastern Band as citizens of the state. The Task Force noted that the state's assumption of jurisdiction had been recognized in Cherokee Trust Funds, 117 U.S. 288, 6 S.Ct. 718, 29 L.Ed. 880 (1866). Nevertheless, without qualification and without excluding North Carolina, the Task Force summarized the principles governing state taxation of Indians:
 Given the existing federal relationship between Indian tribes and the United States, state taxation over reservation Indians or property can only be sustained if authorized by an act of Congress. Moreover, such authorization must be specific and precise for the Supreme Court recognizes that there is a "special area of state taxation" which requires a narrow construction to be given to the scope and extent of state taxation authority.
 Court decisions have confirmed that the states lack the authority to tax either Indian income earned on a reservation or Indian real and personal property located on a reservation
 Task Force on Federal, State, and Tribal Jurisdiction, Final Report to the American Indian Policy Review Commission, 7-8, 254-55 (1976).
 
 
 [44]
 100 S.Ct. 2578, 2582-84 (1980). See text accompanying note 39 supra