Louis WEBSTER, Sr., Alex Askenette, Sr., Sue Askenette, Petitioners-Appellants,

v.

WISCONSIN DEPARTMENT OF REVENUE, Respondent.†

Court of Appeals

*No. 80–925. Submitted on briefs November 19, 1980.—
Decided April 7, 1981.*
(Also reported in 306 N.W.2d 701.)

For the appellants the cause was submitted on the briefs of *Milton Rosenberg* of Madison.

For the respondent the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *George B. Schwahn,* assistant attorney general.

Before Donlin, P. J., Foley, J., and Dean, J.

DEAN, J. Louis Webster, Sr., Alex Askenette, Sr., and Sue Askenette each paid Wisconsin individual income taxes for 1972 and 1973. The taxpayers are tribal

† Petition to review denied.

Indians and contend that Article 2 of the Wolf River Treaty of 1854 provided an exemption to state taxation. They appeal the circuit court judgment affirming the decision of the Tax Appeals Commission denying a refund. The taxpayers also assert that the reinstatement of state income tax immunity by the Menominee Restoration Act, 25 U.S.C. §903, which became effective December 22, 1973, relieved them from state taxation for 1973. Because the state was authorized to impose an income tax on these taxpayers until December 22, 1973, we affirm.

Prior to 1961, the Menominee Tribe held its reservation lands and other assets in tribal ownership under the aegis of the federal government. Neither the assets nor the income of tribal members were subject to state taxation. In 1961, the Menominee Termination Act, 25 U.S.C. §§891–902, was passed ending tribal status and federal supervision. The Termination Act was repealed by the Menominee Restoration Act, which became effective on December 22, 1973. The question is whether the Termination Act gave the state authority to impose state income tax on the taxpayers for 1972 and 1973.

We must first understand the possible bases upon which the Menominees' immunity to pre–1961 state taxation was founded. There are two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members.[1] First, the exercise of such authority may be preempted by federal law.[2] This may result from either a specific treaty between the tribe and the federal government[3] or by pervasive federal regulation in a defined area that ex-

[1] *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142, 100 S. Ct. 2578, 2583 (1980).

[2] *See Warren Trading Post Co. v. Arizona State Tax Comm'n*, 380 U.S. 685, 690 (1965).

[3] *McClanahan v. State Tax Comm'n of Arizona*, 411 U.S. 164, 172 (1973).

cludes state intervention.[4] Second, state regulatory authority may unlawfully infringe upon the right of reservation Indians to be self-governing.[5] Either of these two barriers will provide a sufficient basis for holding state regulatory laws concerning activities of tribal members inapplicable.[6]

The federal preemption doctrine must be examined in light of its two components: federal-tribal treaties and pervasive federal regulation. Although Congress may modify or abrogate an Indian treaty, such intent is not to be lightly imputed to Congress.[7] Thus, in the absence of clear congressional intent, abrogation of treaty rights will not be found, even when reservation status has been terminated by the legislation.[8] Legislation eliminating pervasive federal control of Indian activity, however, in the absence of other bars to state regulation, would authorize the application of state law in the formerly controlled area.[9]

The second barrier, the right of tribal self-government, is ultimately dependent on and subject to the broad power of Congress.[10] Even so, the traditional notion of tribal sovereignty provides an important backdrop against which federal enactments are measured.[11] The backdrop of tribal sovereignty will vary in importance with the issue involved.[12] At the same time, any applicable regulatory interest of the state must be given weight.[13]

---

[4] See Warren, 380 U.S. at 691.

[5] Williams v. Lee, 358 U.S. 217, 223 (1959).

[6] Bracker, 448 U.S. at 142, 100 S. Ct. at 2583.

[7] Menominee Tribe v. United States, 391 U.S. 404, 413 (1968).

[8] Id.

[9] See Public Law No. 280, 67 Stat. 588, as amended, 18 U.S.C. §1162.

[10] Bracker, 448 U.S. at 142, 100 S. Ct. at 2583.

[11] McClanahan, 411 U.S. at 172.

[12] Mescalero Apache Tribe v. State of New Mexico, 630 F.2d 724, 728 (10th Cir. 1980).

[13] Bracker, 448 U.S. at 144, 100 S. Ct. at 2584; McClanahan, 411 U.S. at 171.

With these principles in mind, we must determine whether the Menominees' state tax immunity survived the Menominee Termination Act. The taxpayers argue that the language in Article 2 of the Wolf River Treaty of 1854, providing "for a home, to be held as Indian lands are held," should be interpreted as an exemption to state taxation. They contend that similar language in the treaty considered in *McClanahan v. Arizona State Tax Commission,* 411 U.S. 164 (1973), provided an immunity to state taxation. The taxpayers, relying upon *Menominee Tribe v. United States,* 391 U.S. 904 (1968), assert that as a treaty right, the tax immunity was not abrogated by the Termination Act and remained in effect during the termination period.

The taxpayers' reliance on *McClanahan* is inappropriate. There, the United States Supreme Court interpreted the treaty as precluding the application of all state law to Indians on the reservation, which included state tax law. The Court noted that Congress has consistently acted upon the assumption that Arizona lacked jurisdiction over Navajos living on the reservation. In *Menominee Tribe,* such an interpretation of Wolf River Treaty was not forthcoming. There, the Court recognized that the extension of state jurisdiction over the Menominees did not involve an abrogation of treaty rights.[14] Thus, the Court clearly did not consider the

---

[14] In *Menominee Tribe,* 391 U.S. at 412–13, the court stated:

The provision of the Termination Act (25 U.S.C. §899) that "all statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to the members of the tribe" plainly refers to the termination of federal supervision. The use of the word "statutes" is potent evidence that no *treaty* was in mind.

We decline to construe the Termination Act as a backhanded way of abrogating the hunting and fishing rights of these Indians. While the power to abrogate those rights exists (see Lone Wolf v. Hitchcock, 187 U.S. 553, 564–567, 23 S. Ct. 216, 220–222, 47 L. Ed. 299) "the intention to abrogate or modify a treaty is

language in the Wolf River Treaty to be as expansive as the treaty in *McClanahan,* for had the Court adopted the *McClanahan* interpretation, the Menominees would have been released from federal supervision, yet exempt from state regulation. This clearly was not the case. Moreover, Congress, by the Termination Act, specifically provided for state jurisdiction over the Menominees,[15] unlike the situation in *McClanahan.* The United States Supreme Court in *Menominee Tribe* thus did not construe the Wolf River Treaty to exclude the application of all state law to the Menominees.

The Wolf River Treaty also does not exclude the application of Wisconsin income tax laws to the Menominees. Generally, treaties relating to the rights of Indians should be liberally construed in favor of Indians.[16] In order for exemptions from tax laws to be valid, however, they should be clearly expressed.[17] Treaty construction in favor of Indians, therefore, applies to tax exemptions, but only if the treaty contains language that can reasonably be construed to confer income tax exemptions.[18] We find no "express exemptive language"[19] in the Wolf River Treaty, and the taxpayers admit that the treaty is silent on the subject of taxation. There is moreover no language to reasonably confer such an exemption. While

---

not to be lightly imputed to the Congress." Pigeon River, etc., Co. v. Charles W. Cox, Limited, 291 U.S. 138, 160, 54 S. Ct. 361, 367, 78 L. Ed. 695. See also Squire v. Capoeman, 351 U.S. 1, 76 S. Ct. 611, 100 L. Ed. 883.

[15] *See* 25 U.S.C. §898.

[16] *McClanahan,* 411 U.S. at 174.

[17] *Squire v. Capoeman,* 351 U.S. 1, 6 (1956). We consider the policies determinative of federal taxation issues relating to Indians to be equally valid for this state taxation question.

[18] *Holt v. Commissioner,* 364 F.2d 38, 40 (8th Cir. 1966), *cert. denied,* 386 U.S. 931, *rehearing denied,* 386 U.S. 939.

[19] *United States v. Anderson,* 625 F.2d 910, 916 (9th Cir. 1980), *petition for cert. filed.*

"to be held as Indian lands are held" sums up "the familiar provisions of earlier treaties which recognized hunting and fishing as normal incidents of Indian life,"[20] this phrase does not reasonably indicate that the Menominees are exempt from state taxation.[21]

It should also be noted that the Menominee Tribe did not have reservation status while under the Termination Act. A nondiscriminatory state law is generally applicable to Indians outside the reservation in the absence of express federal law to the contrary.[22] Although the Termination Act specifically provided for an exemption of taxation on the initial transfer of assets and securities, no continuing exemption to state income taxation was provided.[23] Thus, the nondiscriminatory state income tax law could be applied to the Menominees in the absence of contrary federal law. The termination of reservation status further distinguishes this situation from *McClanahan*.

The state income tax exemption the Menominees had prior to 1961 arose from a combination of the right of tribal self-government and a federal regulatory program encouraging Indian economic development. An Indian tribe's regulatory power may preempt the exercise of state regulation, regardless of the level of federal preemption.[24] The right to impose taxes is an inherent,

[20] *Menominee Tribe*, 391 U.S. at 406.

[21] *Anderson*, note 19; *Jourdain v. Commissioner*, 617 F.2d 507, 509 (8th Cir. 1980), *cert. denied*, 449 U.S. 839, 101 S. Ct. 116; *LaFontaine v. Commissioner*, '533 F.2d 382 (8th Cir. 1976).

[22] *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973).

[23] *See* 25 U.S.C. §898.

[24] *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 152, 100 S. Ct. 2069, 2081 (1980), *rehearing denied*, —— U.S. ——, 101 S. Ct. 25; *See also Mescalero Apache Tribe v. O'Cheskey*, 625 F.2d 967, 989 (10th Cir. 1980), *petition for cert. filed.*

although limited,[25] tribal right stemming from tribal sovereignty.[26] The imposition of a state income tax prior to 1961 would have infringed on the Menominees' right to self-government. Moreover, a state income tax would have threatened the federal policy of encouraging tribes to revitalize self-government and to assume control over their economic affairs.[27] Given the federal interest in tribal self-government and economic development,[28] and the state's failure to impose an income tax on the on-reservation Menominees, a more specific expression of federal control was unnecessary.[29]

The right of tribal self-government and the protection afforded by federal regulation were yielded to the state by the Termination Act. The barriers to an imposition of state income tax had been removed. Wisconsin was thus authorized to collect state income tax from the Menominees during the termination period.

The taxpayers further contend that since the state had not imposed its 1973 income tax on the Menominees by December 22, 1973, the enactment date of the Restoration Act, the state was without authority to collect the 1973 taxes. Congress did not revoke Wisconsin's right to collect "obligations for taxes already levied."[30] The taxpayers argue that "levy" refers to the actual collection of the tax and that there was no "levy" until the post-1973 assessment.

---

[25] *Merrion v. Jicarilla Apache Tribe*, 617 F.2d 537, 544 (10th Cir. 1980), *cert. granted*, 449 U.S. 820, 101 S. Ct. 71. Limitations are defined by federal regulatory control.

[26] *Id.*

[27] *Bracker*, 448 U.S. at 142, 100 S. Ct. at 2583.

[28] *Id.; Santa Rosa Band of Indians v. Kings County*, 532 F.2d 655, 664 (9th Cir. 1975), *cert. denied*, 429 U.S. 1038.

[29] For federal preemption of state taxation not arising from treating, *see Eastern Band of Cherokee Indians v. Lynch*, 632 F. 2d 373, 380 (4th Cir. 1980).

[30] *See* 25 U.S.C. §903a(d).

The state was authorized to collect income tax from the taxpayers on income in 1973 received prior to December 22, 1973. Income taxes accrue as income is earned.[31] This is evidenced by the prepayment method of paying income taxes, for payment would not occur if the obligation did not already exist.[32] Wisconsin also may collect tax obligations generated in the state from those who have afterwards removed from its jurisdiction.[33]

While Congress may grant an exemption from taxation, such exemption must be clearly expressed.[34] The taxpayers admit that the use of the word "levy" in 25 U.S.C. §903a(d) is ambiguous and requires construction.[35] The language of 25 U.S.C. §903a(d) does not provide clear congressional intent that the Menominees would be exempt from Wisconsin's 1973 income tax. Indeed, this language suggests that the Menominees should not be exempt of tax obligations accrued to the date of enactment. Although the reintroduction of federal preemption through regulatory control and the right of tribal self-government prevented the imposition of state taxes after December 22, 1973, Wisconsin was not prevented from collecting taxes accruing to that date.

*By the Court.*—Judgment affirmed.

[31] *Ladish Co. v. Wisconsin Dep't of Revenue,* 69 Wis.2d 723, 729, 233 N.W.2d 354, 357 (1975). *See also United States v. Anderson,* 269 U.S. 422, 441 (1926).

[32] *Trepte v. Wisconsin Dep't of Revenue,* 56 Wis.2d 81, 91, 201 N.W.2d 567, 572 (1972).

[33] *Scobie v. Tax Comm'n,* 225 Wis. 529, 537, 275 N.W. 531, 535 (1932).

[34] *Capoeman,* 351 U.S. at 6.

[35] Appellant's brief at 28–29.